**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

ROBERT WEBSTER,

                         Petitioner,

           -against-

MARK ROYCE, Superintendent, Green
Haven Correctional Facility,[1]

                  Respondent.

-------------------------------------------------------- x

**OPINION & ORDER**

**97-cv-2146 (NG)**

**GERSHON, United States District Judge:**

      Robert Webster petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254. He was tried before a jury in the Supreme Court, Queens County, and convicted of two counts of Arson in the First Degree, N.Y. Penal Law § 150.20, two counts of Criminal Mischief in the First Degree, N.Y. Penal Law § 145.12, and two counts of Intimidating a Victim or Witness in the Second Degree, N.Y. Penal Law § 215.16(3). Webster was sentenced to an aggregate term of 50 years to life.

      For the reasons stated below, Webster's petition is denied.

**I.    Factual Background**

      Webster and his co-defendant Claude Johnson were tried together in August 1988 in front of Justice Thomas Demakos of the Supreme Court, Queens County. Francesco Catarisano and James Liander prosecuted the case, and Webster was represented by Joseph Justiz.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the caption has been updated to reflect the current superintendent of Green Haven Correctional Facility.

### a.   The Prosecution's Case

The prosecution's case at trial consisted of the following:  In October 1987, a family moved into a three-story house located at 107-05 Inwood Street in Jamaica, Queens.  The family consisted of a man named Arjune,[2] his wife, his two teenage daughters, his son Shaun Harding, and Herrick Khan, who was referred to at trial as both Arjune's cousin and nephew.

After Arjune and his family moved into the house, Arjune "always" saw "a bunch of guys" "doing business" by his house.  R. 1589.[3]  Presumably to avoid prejudicing the defense, the trial judge had prohibited witnesses from testifying that the "business" at issue was drug-selling.  The men would stand outside a fence that was about eight feet from Arjune's house.  Webster and his co-defendant, Johnson, were often part of this group.  Arjune estimated that he saw Webster in front of his house "fifty times," and Arjune testified that he had spoken to Webster on one occasion.  R. 1611, 1634, 1664.  Khan testified that, in the two weeks before the incidents that led to the arrests of Webster and Johnson, he had seen the two men "every day by the fence." R. 1505.

When Arjune arrived home from work on the evening of November 9, 1987, he again saw men, including Webster and Johnson, "doing business" by his house, and he decided to call the police.  R. 1589, 1593.  Later he testified on cross-examination that he could not remember seeing Johnson there that night.  The police responded but did not arrest anyone.  Because Arjune saw the men continue to collect money from people and "hand them things," he called

---

[2] Arjune is the man's full name.

[3] Citations to "R." refer to the "PageID" numbers on the state court record that respondent filed on the docket.

the police a second time that evening.  R. 1592.  When the police returned, Khan directed them to the top of a tree, where they found a bag.

Officer Angelo Carbone was one of the officers who responded to Arjune's house that evening.  He recalled seeing Webster and another man, Yusif Abdul Qaadir, there.  According to Carbone, Yusif was arrested.[4]

### i.  First Arson Incident

Arjune testified that, at about 4:30 a.m. on November 10, 1987, he awoke from a bad dream and heard his two dogs barking.  He opened a window and saw two men, whom he identified at trial as Webster and Johnson, walking towards his house.  Each man was holding two bottles that were blazing with fire.  Webster was wearing a black jacket with yellow stripes, gray pants, and a black hat.

Arjune yelled, "Hey, guys, what are you doing?" and then shouted for everyone in his house to wake up.  R. 1596.  When Arjune first saw Webster and Johnson, they were near the fence in front of his house.  Arjune watched as Webster tried to open the living room window.  When he saw Arjune, Webster backed away and then threw a bottle at the window.  The bottle hit the window and fell into the front yard.  Johnson also threw a bottle at the window, and it also dropped into the yard.  The men then left.  Arjune recalled hearing Johnson scream, "Doberman"—a reference to one of Arjune's dogs.

Harding testified that he was sleeping in the house's attic when he was awakened by the sound of breaking glass.  When he looked out of the window, he saw two men running away from his house, and he saw flames.  Harding did not see one of the men's face, but he noticed that he was wearing a black jacket with two gold stripes on the side.  Harding observed the other

---

[4] In the trial testimony, Yusif is referred to by his first name.

man jump over the fence and heard him shout, "the Doberman, the Doberman."  R. 1352.  At trial, Harding identified this other man as Johnson.

Harding called 911.  According to the 911 recording, when the operator asked if he had seen the perpetrators, Harding responded, "No. Ma'am, I was upstairs in attic and I just woke up and peeked through the window and there was fire downstairs and they had two big bottle bombs."  R. 1755.  When asked about this statement on cross-examination, Harding said that, while he did not recall what he had told the 911 operator, "I was very, very scared.  Maybe if I did say that, that I didn't identify anybody, I really didn't want to say anything.  I wanted to wait until the police got over."  R. 1364.

Like Harding, Khan also was sleeping in the attic when the sound of breaking glass woke him.  He looked out the window and saw flames and two men—one skinny and the other a "tough guy" wearing a dark jacket with a yellow stripe.  R. 1484, 1493.  The men were walking away from the house, but he was able to see their faces.  At trial, Khan identified Johnson as the "skinny guy" and Webster as the "tough guy."

All three witnesses testified that, even though the arson occurred in the early morning, the streetlights surrounding their home—which Arjune and Harding described as "very bright," R. 1344, 1613—allowed them to see outside.  Harding also credited the flames caused by the firebombs with illuminating the night.

Before the police and fire departments arrived, Arjune, Harding, and Khan worked to put out the fire.  Police Officer Mark Gallagher, who responded to the house with his partner, saw that the house's front window had been broken and that there was charring near the windowsill.  Arjune, Harding, and Khan told Gallagher that one of the perpetrators, the one later identified as Webster, was a black man who had been wearing a black jacket with yellow stripes, gray pants,

4

and a black hat.  Arjune also told the police that, because he had seen the men outside his house before, he "knew their faces."  R. 1600.

Gallagher and his partner canvassed the neighborhood with Arjune.  After driving around for 15 minutes, they approached a group of people that included Johnson.  Arjune identified Johnson as one of the perpetrators of the arson.  The police officers arrested him and brought him back to Arjune's house for a show-up identification with Harding and Khan.  Harding identified Johnson as the man who yelled "Doberman;" Khan identified him as the "skinny" man.  The police officers transported Johnson to the precinct.

### ii.  Second Arson Incident

Later that morning, at approximately 6:20 a.m., after the police and fire departments had left the premises, Arjune and his family were standing in their living room, facing the window, when Arjune saw a beige, four-door car approach the house.  By then, the sun had started to rise. Arjune testified that he saw Webster and a younger man exit the car.  Webster was carrying two lit bottles in his hand.  Webster threw the first bottle through the living room window.  It fell on the carpet and set the draperies, blinds, and carpets on fire.  Arjune picked up that bottle and threw it outside.  Webster then threw the second bottle, which also hit the floor before Arjune threw it outside.  The other man with Webster was carrying a big bottle that was burning.  He threw the bottle at the window; it dropped in the yard and started a fire.  The men drove away.

Khan testified that the family was in the living room when two firebombs entered the house.  Khan then went outside and saw Webster, whom he again called "the tough guy," wearing the same dark coat with a yellow stripe, and two other men.  He said the men fled in a cream Chevrolet.  Harding, who again called 911 after this incident, testified that he did not see the perpetrators.

5

Before the police arrived, Arjune, Khan, and Harding started dousing the flames.  They were soon aided by Officer William Foley and his partner Sergeant Al Heyman, who responded to a radio run communication ("radio run") about the incident.  The fire department arrived a little later.  Arjune testified that he told officials from the police and fire departments that "the guy [who] came the first time, he came back the second time, that's Webster.  I give [] a description of the exact person."  R. 1609.

### iii.  Petitioner's Arrest

On November 11, 1987, the day after the two arsons, Officer Carbone and his partner were stationed in a marked police car in front of Arjune's house to provide protection.  At approximately 10:48 p.m., Webster walked by Arjune's house wearing the same black jacket with yellow stripes as one of the perpetrators had worn during the arsons.  Both Arjune and Carbone testified that Webster started to run from the police, but they had different explanations for why.  According to Carbone, Webster ran after he looked in Carbone's direction.  Arjune testified that he first spotted Webster while Arjune was looking out of his window and that Webster started to run after Arjune screamed to the police officers, "The guy is coming back again."  R. 1610.  Both witnesses testified that, once Webster was running, Carbone and his partner followed him in their car.  Carbone then exited the car and grabbed Webster.  They fell to the ground, and Carbone's partner helped him place Webster under arrest.  While the police were pursuing Webster, Arjune was "screaming frantically," "That's the man that firebombed my house."  R. 1373−74; *see* R. 1611.

Minutes after transporting Webster to the 103rd Precinct, Officer Carbone took a picture of Webster.  He then vouchered the jacket Webster had been wearing.  The jacket had "Laker[s]" written on it.  R. 1387.

6

### b.  The Defense

Webster defended himself by arguing that the witnesses had misidentified him.  Through cross-examination, he tried to show that the witnesses would not have been able to see the perpetrators during the incidents and that their testimony was unreliable.  He also emphasized that, after the incident, Arjune identified in a photo array a man named Joseph Martin as the person who was with Webster during the second arson, but, a few months later, Arjune picked out another man in a lineup.  Webster argued that this misidentification cast doubt on Arjune's ability to correctly identify him as the perpetrator.

### c.  The Verdict

On August 23, 1988, the jury returned a verdict finding Webster guilty of two counts of Arson in the First Degree, N.Y. Penal Law § 150.20, two counts of Criminal Mischief in the First Degree, N.Y. Penal Law § 145.12, and two counts of Intimidating a Victim or Witness in the Second Degree, N.Y. Penal Law § 215.16(3).  Additional charges of Reckless Endangerment in the First Degree, N.Y. Penal Law § 120.25, were not submitted to the jury at the prosecution's request.  Johnson, who was charged only in connection with the first arson, was found guilty of one count each of Arson in the First Degree, Criminal Mischief in the First Degree, and Intimidating a Victim or Witness in the First Degree.

### d.  Sentencing

On September 20, 1988, Justice Demakos sentenced Webster, who was 17 years old at the time of the offenses, to an aggregate sentence of 50 years to life imprisonment.[5]

---

[5] For his convictions for the first incident, Justice Demakos sentenced Webster to concurrent sentences of 25 years to life for Arson in the First Degree, eight and one third to 25 years for Criminal Mischief in the First Degree; and two and a third to seven years for Intimidating a Victim or Witness in the Second Degree.  The judge imposed on Webster the same sentences for

Before imposing the sentence, the judge said, among other things,

I have been in this Criminal Justice System for over 25 years . . . and this is probably the most shocking crimes of all, the use of violence and force against witnesses in our Criminal Justice System.  It reminds me of the drug kingpins in South America who, by their killing of their judges and their prosecutors, have injected so much fear in their community that they are practically immune from prosecution and here in our own community, we've had the killing of a witness to a drug transaction and we've even had the killing of a police officer who was guarding a witness, and even one of our judges in our county has been placed on the police guard for many, many months because he had the audacity to sentence a drug kingpin to life imprisonment and we have the same thing here, you know, the intimidation of a witness by such a callous disregard for his life and the life of his family by the use of molotov cocktails at his home at 4 o'clock in the morning when they were sleeping and completely helpless.  Thank God they were awake or they woke up in time to put out the fires.

And there has been intimidation of Arjune because as brief [sic] as Arjune was, he still has been given a new identity — placed in a new community under guard by a Federal authorities and even as I witnessed them — him and his family on the stand — the fear that was in them, you can't explain the fear that was in them unless you saw it and that's the kind of fear that these — I don't want to describe the people that are out there trying to intimidate the community.  But, [Johnson and Webster] are part of that group.

R. 1956−58.

The judge sentenced Johnson to an aggregate sentence of 25 years to life imprisonment.

## II.     Procedural History

### a.  State Court Proceedings

Webster appealed his conviction to the Appellate Division, Second Department.  He claimed, among other things, that his sentence was excessive.  The Appellate Division affirmed the conviction.  *People v. Webster*, 169 A.D.2d 796, 796 (2d Dep't 1991).  It found that Webster's sentence was not excessive under the circumstances, "including the defendant's repeated attempts to set the complainant's house on fire while the complainant and his family

---

each of his convictions for the second incident as he did for the first.  The judge ran each of the sentences for the second incident consecutive to those for the first.

were inside." *Id.* at 797.  The Court of Appeals denied leave to appeal on May 10, 1991.  *People v. Webster*, 77 N.Y.2d 1002 (N.Y. 1991).

In August 1995, Webster filed a pro se motion to vacate his conviction under N.Y. Criminal Procedure Law ("CPL") §§ 440.10, 440.20, and 440.30.  He argued, among other things, that his sentencing proceeding was unconstitutional under the Sixth and Fourteenth Amendments because he was sentenced for crimes committed by others and crimes for which he was never charged.  Webster's motion was denied by Justice Demakos on October 12, 1995. Webster did not seek leave to appeal to the Appellate Division.

On August 16, 2001, Webster filed another pro se § 440 motion.  Justice Demakos had since retired, and the motion was heard by Justice Joseph Rosenzweig, who denied it on October 9, 2001.  The Appellate Division denied leave to appeal on January 22, 2002.

Webster filed a third pro se § 440 motion on October 8, 2014.  Subsequently, before the court issued a ruling, he retained Jennifer Bonjean as pro bono counsel.  Bonjean, who also represents Webster in this habeas proceeding, received permission from the state court to replace Webster's 2014 pro se motion with a counseled one.  Before filing that motion, Bonjean repeatedly tried to obtain Justiz's file and to interview him about Webster's case.  After his conviction, Webster also made numerous attempts to contact Justiz about his case.  The state court ultimately granted Bonjean permission to subpoena Webster's file from Justiz.  In response, Justiz submitted an affidavit stating that he no longer had the file.  According to Bonjean, Justiz never responded to Bonjean's and Webster's inquiries.

Webster's counseled § 440 motion was filed on December 29, 2017.  Webster raised every claim he is pursuing in this court (in addition to others) and sought a new trial or, at minimum, an evidentiary hearing on his claims.  He further argued that, even if the state court

9

did not vacate his convictions, he was entitled to a new sentencing hearing because his sentence constituted cruel and unusual punishment under the Eighth Amendment and because he was sentenced based on conduct for which he was not responsible

In a decision dated October 31, 2018 ("§ 440 Decision"), Justice Gene R. Lopez denied Webster's third § 440 motion without conducting a hearing.  The Appellate Division denied leave to appeal on January 31, 2019.

### b.  Federal Habeas Proceedings

Webster's conviction was final on August 10, 1991, and he filed a habeas petition in this court on April 19, 1997.  Effective April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), introduced a statute of limitations—generally one year from when the petitioner's conviction became final—for the filing of habeas petitions in federal court.  On June 5, 1998, I granted respondent's motion to dismiss Webster's petition as time-barred under 28 U.S.C. § 2244(d)(1) because it was filed "almost a year after the effective date of AEDPA, and almost six years after [Webster's] conviction became final."  Dkt. No. 17 at 84.  Respondent had not filed the state court record or briefed the merits of Webster's petition, so I did not address the merits.

On June 24, 1998, the Second Circuit held in *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998), that "prisoners whose convictions became final prior to the effective date of [AEDPA]'s statute-of-limitations provision should have been allowed a period of one year after that effective date in which to file petitions."  On October 28, 1998, upon stipulation of the parties, the Second Circuit relied on its decision in *Ross* to vacate my dismissal of Webster's petition and to remand the case for further proceedings.  But, as a result of a clerical error, Webster's case was not then reopened in this court.

10

I became aware of the error when, on March 22, 2019, the court received a pro se letter from Webster inquiring about the status of his petition.  On April 11, 2019, I reopened Webster's case, ordered respondent to file the state court record on ECF, and appointed counsel for Webster.  Dkt. No. 19.  I later granted Webster's request to substitute Bonjean as his counsel.

On January 24, 2020, Webster filed an amended habeas petition, which raises many of the claims contained in his third § 440 motion.  He filed a memorandum of law in support of that petition on April 25, 2020.  Webster's amended habeas petition was fully briefed on December 16, 2020.

## III.   Standard of Review

AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation marks omitted).  Under AEDPA, a federal court may not grant a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless it concludes that the state court decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)−(2).   Factual determinations made by a state court "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  § 2254(e)(1).[6]

---

[6] While the State does not argue that Webster has failed to exhaust all available remedies in the state courts, it has not expressly waived the requirement.  *See* § 2254(b)(3); *Carvajal v. Artus*, 633 F.3d 95, 105 (2d Cir. 2011), *cert. denied*, 565 U.S. 888 (2011).  Because I deny Webster's

A state court decision is "contrary to clearly established federal law if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (internal quotation marks and alterations omitted) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and some internal quotation marks omitted).

A state court decision involves an unreasonable application of Supreme Court precedent "if it correctly identifies the governing legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the particular case." *Chrysler*, 806 F.3d at 117 (internal quotation marks and alterations omitted). An erroneous application of federal law is not necessarily an unreasonable one. *Williams v. Taylor*, 529 U.S. 362, 411−12 (2000). "It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508−09 (2013) (quoting *Richter*, 562 U.S. at 102). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Lockyer*, 538 U.S. at 75–76 (quoting *Williams*, 529 U.S. at 411).

The Supreme Court and the Second Circuit have "had fewer opportunities to consider what constitutes an 'unreasonable determination of the facts' under section 2254(d)(2) than

---

application on the merits, I do not address whether any of his claims are unexhausted. *See* § 2254(b)(2); *White v. Harper*, 2021 WL 3269423, at *6 n.5 (E.D.N.Y. July 30, 2021).

[they] have had to address the 'contrary to, or involved an unreasonable application' of federal law prong of section 2254(d)(1)." *Cardoza v. Rock*, 731 F.3d 169, 177 n.5 (2d Cir. 2013). Yet the law is clear that a federal court cannot determine that a state court's decision satisfies § 2254(d)(2) "merely because [it] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Where "[r]easonable minds reviewing the record might disagree" as to the relevant factual finding, the state court's factual determination is not unreasonable. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). A "state court's finding might represent 'an unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence." *Cardoza*, 731 F.3d at 178 (internal citations omitted).

Finally, "in addition to satisfying § 2254(d), a habeas petitioner must also demonstrate by a preponderance of the evidence that his constitutional rights have been violated." *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018) (internal quotation marks omitted). This requires "a legal analysis that the district court conducts *de novo*." *Id.*

## IV. Discussion

Webster raises the following claims in his amended habeas petition: (1) the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by suppressing a radio run indicating that the State's witnesses did not see the people who committed the second arson; (2) relatedly, the prosecution knowingly elicited perjured testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), when it allowed Arjune and Khan to testify that they saw Webster commit the second arson; (3) alternatively, if the radio run were disclosed to trial counsel, he was ineffective for failing to use it to impeach Arjune and Khan; (4) the State

13

suppressed a police report and two officers' memo books that presumably contained exculpatory information about the second arson; (5) the prosecution violated Webster's rights under *Brady* when it suppressed a 911 call from an anonymous caller that refuted the prosecution's theory that Webster was selling drugs outside Arjune's home on November 9, 1987; (6) relatedly, the prosecution knowingly elicited false testimony from Arjune and Officer Carbone that Webster was one of the people selling narcotics outside Arjune's home on that night; (7) Webster's trial lawyer was ineffective when he failed to present evidence showing that Webster was arrested wearing a gray coat rather than a Lakers jacket; (8) Webster was denied due process at sentencing when the court imposed a sentence based on criminal activity for which Webster had no responsibility; and (9) Webster's sentence of 50 years to life imprisonment violates the Eighth Amendment because it constitutes *de facto* life without parole and because the state court imposed it without considering his youth.

### a.   Petitioner's Claims Regarding the Radio Run

In January 2014, in response to his request under New York's Freedom of Information Law, N.Y. Pub. Off. Law §§ 84–90, Webster received the recording of a radio run from 6:23 a.m. on November 10, 1987—immediately after the second arson.  The radio run begins with a police dispatcher broadcasting that there had been a firebombing at a house at 107-05 Inwood Street.  A female officer responds that an arrest had been made there.  The dispatcher then says, "I see what they're stating — alright, they state the person who set that fire before is at that location."  The same female officer then replies that there were "two perps" at the location earlier and that one had been arrested.  The dispatcher says, "Sergeant Adam," who respondent presumes to be either Officer Foley or Sergeant Heyman, is responding to the location.  Unit "3-Queen," which respondent presumes is Officer Gallagher and his partner, report, "We're at the

[station] house with one arrest.  There was one male we were still looking for – a male black, with a black jacket, yellow rings around the sleeves, gray pants, and a black hat."  The dispatcher then transmits that description over the radio.  After a brief lull, "3-Sergeant," who is likely Sergeant Heyman according to respondent, reports that they had put the fires out with an extinguisher.  The dispatcher then asks the sergeant if the perpetrators are still at the scene, and an officer replies, "Negative, Central, he's not on the scene.  He fled in a vehicle — we're going to get a description for you."  Someone asks, "Any description?"  The dispatcher then repeats the description provided a few minutes earlier by 3-Queen.  An officer referred to as "3-Adam" next states that "the complainant" said that the perpetrators were driving a cream-colored Caprice Classic and had fled north.  Soon after, "3-Base" says, "Be advised that the description we gave over was from the earlier firebombing; it's unknown if it's the same perp."  The dispatcher repeats this.  3-Adam next says, "They did not see a perp for this one."  The dispatcher then repeats this.

Because Arjune and Khan testified that they saw Webster commit the second arson, the contents of the final statement on the radio run form the basis of several of Webster's claims.  Webster argues that the prosecution violated its obligations under *Brady* by not producing the radio run to counsel.  He further contends that Webster's due process rights under *Napue* were violated because the prosecution knew or should have known that Arjune and Khan testified falsely that they saw Webster participate in the second arson.  Alternatively, Webster asserts that, if the radio run *were* turned over to Justiz, Justiz was ineffective for not using it to impeach Arjune and Khan.

The state court rejected Webster's *Brady* claim with the following analysis:

> The defendant affirmatively states that it was either Police Officer Foley and Sergeant Heyman who informed the dispatcher that "they did not see a perp for this one." It has not been established that one of these police officers made such a report. More importantly it has not been established who was the source of that information. Therefore the defendant has not established there is a reasonable probability that the allegedly withheld recording would have the changed the outcome.

§ 440 Decision at 32. In response to Webster's alternative argument in his § 440 motion that the radio run constituted newly discovered evidence (an argument he does not raise here), the state court found that Webster had failed to prove that the recording was not available to trial counsel. Webster argues that the state court's decision "involved an unreasonable application of[] clearly established Federal law," § 2254(d)(1), and "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Under *Brady*, "to the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." *DiSimone v. Phillips*, 461 F.3d 181, 192 (2d Cir. 2006) (internal alterations and quotation marks omitted). "To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). A finding of prejudice, or materiality, is assessed in light of the trial evidence. *Id.* at 103. "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Id.*

The record in this case supports the state court's conclusion that Webster had not shown that the radio run was suppressed. Indeed, although such a finding is not necessary to deny

16

Webster's motion, the record tends to support a finding that the radio run was produced.  First, the radio run was discussed in open court; the prosecution asked Officer Foley about it twice during his testimony.  If counsel had not received a copy of the recording, he presumably would have raised the issue.  Moreover, in an affidavit submitted in the § 440 proceedings, one of the prosecutors in the case, Liander, wrote, "Although, given the significant passage of time, I have no specific recollection of turning copies of [the tape containing the radio run] over to defense counsel, it would have been my practice to do so."  R. 743.  Liander also explained that it would have been technologically difficult for him to suppress the radio run.  The radio run was on one side of a cassette tape that also included, among other recordings, a 911 call that Justiz acknowledged at trial was in his possession.  Liander noted that, in the late 1980s, "there were no mechanisms available to easily edit these tapes," making it highly probable that the tape was "copied in full."  R. 743.

The state court record also exhibits a willingness on the prosecution's part to share the information it gathered.  In April 1988, the prosecutors met with counsel for Webster and Johnson and allowed them to inspect their office's file and any physical evidence that the prosecution had recovered.   Furthermore, the prosecution disclosed other exculpatory information, including that Arjune had misidentified Joseph Martin as the other perpetrator of the second arson. And, significantly, in response to a discovery demand by Johnson's lawyer, Liander turned over to him a Sprint report that memorialized the information at issue in the radio run: "06:29 – No PRPs spotted this time – fire bomb thrown frm auto."

Webster points to the following to argue that the radio run was suppressed: (1) it is inconceivable that Justiz would not have used the contents of the recording to question Arjune, Khan, or Officer Foley at trial when his sole defense was that the witnesses had misidentified his

17

client; (2) Justiz never offered a statement indicating that he received the radio run; (3) Webster does not recall Justiz telling him about the radio run; and (4) Liander, who had a habit of memorializing his disclosures to defense counsel in written replies, made no mention of the radio run in those replies.  But, considered together with the contrary evidence described above, the factors Webster cites do not show that it was unreasonable for the state court to find that Webster had not proven that the radio run was suppressed.

In addition to failing to show that the radio run was suppressed, Webster has not shown that the statement "[T]hey did not see a perp for this one" is material under *Brady*.  In *Kyles v. Whitley*, the Supreme Court clarified that

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [*United States v. Bagley*, 473 U.S. 667 (1985),]'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678) (other internal citations omitted); *accord Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001).

Here, the record offers significant support for the reliability of Arjune's and Khan's identifications of Webster as a perpetrator of both incidents.  Webster was far from a stranger to Arjune and Khan.  Arjune testified that he had seen Webster "fifty times" in front of his house and that he "knew" Webster's face.  R. 1600, 1611.  Khan said he had seen Webster in front of his house "every day" for a period of two weeks.  R. 1505.  During each of the arson incidents, they had ample time to identify him and were at close range with good lighting conditions.  Their

18

identification testimony was unhesitant and unequivocal.   And, when counsel vigorously challenged the eyewitnesses' identifications of Webster with various lines of questioning, Arjune's and Khan's answers were unyielding.   The radio run may have provided counsel with an additional line of questioning—*e.g.*, "Did you ever tell the police you didn't see the perpetrators?"—but I cannot conclude that it would have led to answers sufficient to overcome my confidence in the verdict.

Even in the unlikely event that the actual hearsay radio run had been admitted into evidence, the prosecutor surely would have pointed out there was no evidence as to whom "they" (those who did not identify the perpetrators) referred and that it could have been Harding or the other three victims in the house who did not testify.   The prosecutor also may have noted that the radio run includes a statement from the dispatcher that "they state the person who set that fire before is at that location"—a statement that implies that some people in the house did see the perpetrators.   The defense could have argued the likelihood that "they" referred to one or both eyewitnesses, but the issue would have remained equivocal.   In the face of the live testimony of the victims, the force of the radio run was limited.   And relief on habeas corpus requires more than the mere possibility of a different outcome.   I simply cannot conclude, based upon my review of the record and the law that, in the absence of the evidence, Webster did not receive "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Emphasizing that Justiz did not respond to Webster's and Bonjean's attempts to question him about his case and that the state court denied his request for an evidentiary hearing, Webster seeks a federal evidentiary hearing to question Justiz and Liander on whether the radio run was turned over to the defense.   But, in *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011), the Supreme

Court held that a federal court may not consider new evidence adduced at a federal evidentiary hearing to determine whether a petitioner has satisfied § 2254(d)(1).  *See Riley v. Noeth,* 802 F. App'x 7, 11 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 682 (2020).[7]  Here, for the reasons previously stated, the state court record does not establish that Webster's rights under *Brady* were violated, which compels denial of his claim under § 2254(d)(1).

Section 2254(d)(2) specifies that a court must review a state court's decision "in light of the evidence presented in the State court proceeding."  *See Pinholster*, 563 U.S. at 185 n.7.  But, even if Webster were entitled to a hearing on his *Brady* claim under that subsection, it would not be worthwhile.  In the unlikely event that Webster were able to demonstrate through factfinding

---

[7] In *Riley*, as here, the petitioner sought a federal evidentiary hearing after the state court had denied his § 440 motion without a hearing.  *Id.* at 9.  The Second Circuit deemed petitioner's request "misplaced."  *Id.* at 11.  Citing *Pinholster*, it explained that it must "evaluate the reasonableness of a state court's merits determinations under § 2254(d)(1) only on the record which was before the state court at the time of the merits determination and without regard to any information which is or could be gathered at a federal court evidentiary hearing."  *Id*.

Webster also seeks the opportunity to engage in discovery.  Although a district court may permit a habeas petitioner to take discovery upon a showing of "good cause," Fed. R. Governing § 2254 Cases 6(a); *Akassy v. Kirkpatrick*, 2019 WL 125947, at *1 (S.D.N.Y. Jan. 8, 2019), I see no reason to grant Webster access to discovery to pursue his claim under § 2254(d)(1) for the reason that, under *Pinholster*, any information that Webster gathers cannot be considered in my determination under that subsection.

Webster relies heavily on *Drake v. Portuondo*, 321 F.3d 338 (2d Cir. 2003), to support his request for discovery or a hearing.  The petitioner in *Drake* argued that the prosecution knew or should have known that one of its witnesses was committing perjury.  *Id.* at 345.  Because the state court had denied his § 440 motion without a hearing, the Second Circuit found that the petitioner was entitled to develop the factual record in federal court—through discovery and potentially an evidentiary hearing.  *Id.* at 345−47.  It explained that, while "a state court's conclusions of law are [] entitled to considerable deference under AEDPA," "because the state courts did not permit the development of the factual record, and because the Appellate Division relied on that incomplete record, there is at present no way for a federal habeas court to assess whether the Appellate Division's conclusion represented an unreasonable application of federal law."  *Id.* at 345.  The Court in *Drake* cites only § 2254(d)(1), and it thus appears that *Pinholster* overruled *Drake* on the use of federal evidentiary hearings to evaluate claims under that subsection.

that the prosecution suppressed the radio run, he could not show that it constitutes material evidence. Therefore, his request for an evidentiary hearing is denied, and so too is his claim under § 2254(d)(2).

Webster asserts that his due process rights under *Napue* were violated because the prosecution knowingly elicited, or failed to correct, perjured testimony from Arjune and Khan that Webster participated in the second arson. A court evaluating a *Napue* claim must consider: "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in [*United States v. Agurs*, 427 U.S. 97 (1972)]." *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003). Under *Agurs*, prejudice is shown "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103; *see United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).

Webster has not met his burden to establish the fundamental component of a *Napue* claim: that either Arjune's or Khan's testimony was false. As already mentioned, the "they" referenced in the last sentence of the radio run could have referred to some combination of the four other people in the house during the second arson—Harding, who testified that he did not see the perpetrators, and Arjune's wife and two daughters, who did not testify at trial.

Finally, in footnotes, the parties address Webster's alternative argument that, if the radio run in fact had been produced to defense counsel, counsel's failure to use it to impeach Arjune and Khan made him constitutionally ineffective. Under the familiar standards for such a claim, Webster must both "(1) show that his counsel's representation 'fell below an objective standard of reasonableness' and (2) 'affirmatively prove prejudice.'" *United States v. Rosa*, 666 F.

21

App'x. 42, 44 (2d Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).

If either prong is lacking, the court need not address the other.  *Strickland*, 466 U.S. at 697.

Here, for essentially the same reasons discussed in concluding there is an absence of materiality,

I find a failure to show prejudice.  *See id.* at 694 (deriving the prejudice standard for ineffective

assistance of counsel claims from the "test for materiality of exculpatory information"); *Ennis v.*

*Kirkpatrick*, 2011 WL 1118604, at *11 (S.D.N.Y. Mar. 28, 2011), *report and recommendation*

*adopted,* 2011 WL 2555994 (S.D.N.Y. June 27, 2011).[8]

### b.  *Brady* Claim Regarding a Police Report and Memo Books

Webster asserts that his rights under *Brady* were violated when the police destroyed or

"voided" a police report labeled UF61 #17427 that concerned the second arson and "presumably

reflected the witnesses' statements that they did *not* see a perpetrator of the second incident."

---

[8] In *Waiters v. Lee*, 857 F.3d 466, 468−49 (2d Cir. 2017), the Second Circuit concluded that the district court had erroneously granted habeas relief on the ground that petitioner's trial counsel had been ineffective.  The dissent asserted that the standard for assessing prejudice under *Strickland* was the same as that under *Brady* and that the petitioner had established prejudice under this standard.  *Id.* at 487.  The majority addressed the dissent's discussion in a footnote:

> [T]he dissent errs in concluding that *Brady* and *Strickland* prejudice are []
> necessarily identical in their application. As our learned predecessor astutely
> observed, "words are chameleons, which reflect the color of their environment,"
> *Commissioner v. Nat'l Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948) (L.
> Hand, *J.*), such that "identical language may convey varying content," *Yates v.*
> *United States*, 135 S.Ct. 1074, 1082 (2015).  Thus, rather than look to a body of
> case law separate from that which governs the claim at issue here, we conclude
> that under well-established precedent specific to *Strickland*—and particularly to
> claims raised in a § 2254(d) petition—the state trial court's determination that
> [counsel's] conduct did not prejudice [the petitioner's] defense was not
> objectively unreasonable.

*Id.* at 479 n.23.  The dissent responded that the majority "cites no relevant law, and splits from published decisions by every other circuit in the country."  *Id.* at 487.  While the majority and the dissent differed as to whether counsel's performance prejudiced the petitioner, it does not appear that their disagreement regarding the standard to be applied had any impact on their conclusions.

Memo. of Law at 19.[9]  He also alleges that the defense never received Officer Foley's and Sergeant Heyman's memo books, which "presumably memorialized the information that witnesses did not see who fire-bombed the house the second time."  Memo. of Law at 19.

The state court dismissed as speculative Webster's claims that these documents contained exculpatory information.   § 440 Decision at 33.   Webster provides no reason to conclude otherwise on habeas.  Tellingly, his claims are based on what "presumably" is contained in these documents.  The state court's decision thus was neither an unreasonable application of the law nor an unreasonable determination of the facts.  Furthermore, to the extent Webster seeks a federal evidentiary hearing on this claim, that request is denied.  As discussed above, *Pinholster* and the language of § 2254(d)(2) restrict, if not bar, his entitlement to a federal evidentiary hearing.  In any event, his conclusory assertions do not warrant a hearing.

### c.   Claims Regarding a 911 Call by an Anonymous Caller

Both Arjune and Officer Carbone testified that they saw Webster in front of Arjune's house on the evening of November 9, 1987.  Carbone testified that Yusif Abdul Qaadir was arrested that night.  According to the police report, Yusif was wearing a "tan jacket." R. 465.

Webster contends that the prosecution violated *Brady* by suppressing a 911 call from an anonymous caller at 5:55 p.m. that evening.  The 911 caller describes seeing two black men— one in a black snorkel coat and the other in a beige leather coat—selling crack near Arjune's house.  According to Webster, the call shows that he was not one of the people selling drugs in

---

[9] In his § 440 motion, Webster referred to two other police reports as evidence that UF61 #17427 was destroyed:  UF61 #17424 describes the first arson and then states that a "[s]econd incident occurred a few hours later see UF61# 17427."  R. 438.  UF61 #17127 states, "This complaint number was issued in error, said complaint is a duplicate report which is being carried under U.F. 61 [#] 17424, . . . and therefore this complaint number is being marked: …….. VOID!!!!" R. 440.

23

front of Arjune's house that night because he was never described as wearing a black snorkel coat.  Webster asserts that, if the jury had heard the 911 call at trial, it

> would have been forced to reject the prosecution's theory that Petitioner was one of the drug sellers outside Arjune's home and more importantly would have been forced to reject the theory that Petitioner fire-bombed Arjune's home in retaliation for Arjune calling the police and causing the arrest of Yusif (a man Petitioner did not know, had never met, and has never seen in his life).

 Memo. of. Law at 36.  Webster also argues that, by allowing Arjune and Officer Carbone to testify falsely that Webster was involved in the drug sales on November 9, the prosecution violated *Napue*.

The state court rejected Webster's *Brady* claim by finding that he had not shown that the 911 call had been suppressed.  It assumed that the 911 call was one of two made by Arjune on November 9.  Because Arjune had testified that he made two such calls, the state court concluded that Justiz either had a copy of the 911 call or had determined that he did not need a copy.  § 440 Decision at 28.[10]  Webster argues that the state court's assumption that Arjune made the 911 call constitutes an unreasonable determination of the facts under § 2254(d)(2).  Having listened to Arjune's 911 call and the anonymous 911 call at issue, I agree.  The anonymous caller's accent and cadence differ significantly from those of Arjune.[11]

Nonetheless, Webster is not entitled to habeas relief.  Even if he could show that the prosecution suppressed the 911 call, he cannot satisfy *Brady*'s prejudice requirement.  Webster's claim is premised on a mischaracterization of the prosecution's theory at trial.  The prosecution

---

[10] This analysis is contained in the portion of the state court's decision addressing Webster's claim that the 911 call constituted newly discovered evidence, which the state court referenced when it rejected Webster's *Brady* claim regarding the 911 call.  § 440 decision at 33.

[11] In a footnote in his opposition, respondent appears to concede that the callers are different.  Opp. at 3 n.5 ("The first 911 caller declined to give his name or address.  The second caller is Arjune.)

emphasized that Arjune, Khan, and Harding had seen Webster and Johnson outside their house on multiple occasions, but—consistent with the state court's pretrial ruling, *see* R. 1410—the prosecution and its witnesses did *not* assert that the men near the house were selling drugs.  On summation, for example, the prosecutor said that the men were doing "business" or "doing whatever they were doing."  R. 1830, 1848.  Whenever a witness accidentally testified that the men were selling drugs, defense counsel objected, and the judge struck the testimony.  *See, e.g.*, R. 1382, 1591.[12]  Because defense counsel made a deliberate effort to avoid the mention of drug dealing during the trial to avoid prejudicing his client, he would not have introduced a 911 call that made evident that the "business" taking place in front of Arjune's house was drug selling. Therefore, he cannot show that any potential suppression of the 911 call caused him prejudice.

Webster also has not shown that the 911 call was exculpatory.  Webster's argument is premised on the notion that he only had one jacket—the Lakers jacket—such that he could not have been seen in a black snorkel jacket.  But, of course, he could have had another jacket. Critically, neither Arjune nor Carbone were asked what Webster was wearing when they saw him on November 9.  Moreover, even if Webster were wearing the Lakers jacket that evening, the record does not establish that the man who was with Yusif when the anonymous caller dialed 911, at 5:55 p.m., was the same person who was there when Yusif was arrested, at 6:45 p.m. Arjune testified that there were five people present when Yusif was arrested.  Simply put, Webster substantially overstates the significance of the 911 call's value to his defense.

---

[12] In contrast, during his jury charge, the judge instructed the jury, with regard to the first arson, that the prosecution alleged that the defendants, "with the motive of intimidating Mr. Arjune, who was a witness to a drug transaction fronting his residence located at 107-05 Inwood Street, recklessly caused physical injury to Mr. Arjune by intentionally damaging his property."  R. 1882−83; *see also* R. 1910.  The judge denied Justiz's application for a mistrial based on the judge's use of the word "drug."

Finally, Webster's claim under *Napue* lacks merit.  For the reasons just described, he has not met his burden to show that the testimony of Arjune and Carbone was false.  *See Shih Wei Su*, 335 F.3d at 127.

### d. Petitioner's Claim of Ineffective Assistance of Counsel Concerning His Arrest Photograph and Dwayne Curry's Testimony

At Webster's trial, Officer Carbone testified that he arrested petitioner after he saw him walking near Arjune's house on November 11, 1987 while wearing a black jacket with yellow stripes.  The jacket thus matched the description of the jacket that, according to Arjune, Harding, and Khan, was worn by one of the perpetrators.  Webster asserts that Carbone's testimony "was a lie" because Webster was wearing a gray coat when he was arrested.  Memo. of Law at 43.  He relies on both an arrest photograph that depicts him wearing a gray coat and an affidavit from Dwayne Curry in which Curry says that he was with Webster right before his arrest and that Webster was wearing a gray coat.  Webster contends that Justiz provided ineffective assistance of counsel when he did not introduce into evidence at trial the arrest photograph and Curry's testimony.

Webster neglects to mention that, in his reply brief in the § 440 proceedings, he conceded that the arrest photograph had, in fact, been admitted into evidence by the prosecution at trial.  In that brief, Webster narrowed his claim to argue that Justiz was ineffective for not introducing the arrest photograph at the pretrial suppression hearing and failed to highlight to the jury, through cross-examination or otherwise, that Webster was wearing a gray jacket at arrest—claims that Webster does not pursue here.  Because, as Webster previously acknowledged, the arrest

26

photograph was admitted into evidence at trial, Webster, of course, has not shown that Justiz was ineffective for failing to introduce it.[13]

In any event, the record does not support Webster's contention that the photograph at issue depicts what he was wearing at his arrest.  The record shows that the police took two photographs of Webster.  Carbone took the first "minutes after" he arrived with Webster at the precinct before he vouchered the Lakers jacket.  R. 1374−78.  Although the trial court denied the prosecution's request to admit that photograph into evidence, a prosecutor told the court that it depicted "exactly what Mr. Arjune described [Webster] to have been wearing at the time of the incident," *i.e.*, the Lakers jacket.  R. 1381.  The second photograph—the one admitted at trial— was taken of Webster after the Lakers jacket had been vouchered.  Indeed, in an affidavit submitted with his § 440 motion, Webster acknowledged that he was photographed at two different times after his arrest—first by Officer Carbone at the precinct while he was wearing a black Lakers jacket and then at Queens Central Booking in a gray coat.[14]

Webster's argument that trial counsel was ineffective for not calling Curry as a witness is also unpersuasive.  In affidavits submitted with Webster's § 440 motion, Webster and Curry state that they were together when Webster was arrested and that Webster was wearing a gray coat.

---

[13] In the portion of its decision that summarized Webster's claims, the state court acknowledged Webster's concession that the arrest photograph had been introduced at trial.  § 440 Decision at 12; *see also* § 440 Decision at 27.  But the state court did not do so when it denied his claim of ineffective assistance of counsel, writing instead that Webster "has not demonstrated that trial counsel did not have a legitimate explanation or strategy by not introducing the defendant's arrest photograph to impeach Police Officer Carbone at the pre-trial suppression hearing *or at the trial*."  § 440 Decision at 35 (emphasis added).

[14] Webster claimed that he was photographed in the Lakers jacket after Officer Carbone told him to take off the gray coat that he was wearing and to put on a Lakers jacket that the officer had in his possession.  He offers no proof of this, other than his own statements, and makes no such claim in his habeas petition.

Webster also states that he told Justiz that Curry could testify that Webster was not wearing a Lakers jacket when he was arrested.

In denying Webster's claim regarding Curry's testimony, the state court relied on statements, submitted by the prosecution with its § 440 opposition, that were published on a website called "The Robert Webster Freedom Project."   The statements are written in the first person and describe the circumstances leading up to Webster's arrest.   According to the website's account, Webster was arrested after he left the house of Doris Mathews, a family friend, to buy her cough medicine.   Curry is referenced only once in the account, which states that, after Webster was taken into custody, he called his home to speak to his parents, but he reached Curry instead.   Webster told Curry to tell his parents that he had been arrested. "My cousin refused to believe me," the account continued.   "I had just left him at Ms. Mathews' house."   R. 755.   The state court concluded that the account of Webster's arrest on the website "raises an overwhelming doubt as to his current claim Mr. Curry had any relevant information," and therefore it was "highly unlikely" that Webster told Justiz about Curry's presence at the scene of his arrest.   § 440 Decision at 36.

Webster now argues that the state court's decision constitutes "an unreasonable determination of the facts" under § 2254(d)(2) and that he is entitled to a federal evidentiary hearing because "it was wildly inappropriate for the state court judge to make factual findings in private based on rank hearsay from a website without at least determining *who* made the statement on the website and affording Petitioner the opportunity to reconcile any discrepancies."   Memo. of Law at 46–47.   But Webster did not raise this argument in the state court.   In his § 440 reply, Webster merely wrote, "There is nothing inconsistent between Petitioner['s] and Curry's affidavits and the website the State references."   R. 776 n.2.   In effect,

he accepted the accuracy and reliability of the website.  I therefore conclude that it was not unreasonable for the state court to rely on the facts on the website to deny Webster's claim of ineffective assistance of counsel.

### e.  Claims Regarding Webster's Sentence

#### i.  Due Process Claim

As set forth above, before it sentenced Webster, the state court judge stated that the arson incidents "remind[ed him] of the drug kingpins in South America who, by their killing of their judges and their prosecutors, have injected so much fear in their community that they are practically immune from prosecution."  R. 1957.  He also referenced "the killing of a witness to a drug transaction" locally, "the killing of a police officer who was guarding a witness," and the fact that "even one of our judges in our county has been placed on the police guard for many, many months" after sentencing a "drug kingpin."  R. 1957.  According to Webster, the judge's reference to "the killing of a police officer who was guarding a witness" concerned the murder of Officer Eddie Byrne while he was guarding Arjune's house on February 25, 1988, over three months after Webster's arrest.  Howard Mason, the leader of the "Bebos" drug gang, ordered the murder from prison.  *United States v. Nichols*, 56 F.3d 403, 406 (2d Cir. 1995).  No known connection existed between Mason and Webster.  *See id.*

Webster argues that he was denied his right to due process because the judge's remarks show that he was sentenced based on conduct for which he was not responsible.  Because Webster's sentence was within the sentencing range, he is entitled to habeas relief only if "the state court's decision was wholly devoid of discretion or amounted to arbitrary or capricious abuse of discretion, or that error of law resulted in improper exercise of sentencer's discretion and thereby deprived the petitioner of his [or her] liberty."  *Velez v. Duncan*, 2005 WL 1221836,

at *5−6 (S.D.N.Y. May 13, 2005) (internal quotation marks omitted), *report and recommendation adopted*, 489 F. Supp. 2d 317 (S.D.N.Y. 2007); *see White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

Webster has not met that standard.  The judge merely stated that Webster's conduct "remind[ed]" him of other types of criminal behavior involving the intimidation of law enforcement officials, not that it was sentencing Webster for that behavior.  R. 1957.  Moreover, the court specifically acknowledged the crimes for which Webster was convicted as well as the fear and harm Arjune and his family experienced.  *See Weinberg v. Warden Riker's Island Corr. Facility*, 2012 WL 5834393, at *8 (E.D.N.Y. Nov. 16, 2012).[15]  There is no basis to conclude that Webster was sentenced for anyone's conduct but his own.

### ii.  Eighth Amendment Claim

At the sentencing proceeding, defense counsel asked the judge to sentence Webster to 15 years to life, the minimum available sentence.  Counsel emphasized that Webster was a high school student who had just turned 17 at the time of the incidents, that he had no juvenile or criminal record, and that he had a supportive family.  When it imposed its sentence on Webster, the state court did not mention Webster's age.

---

[15] Webster relies heavily on *United States v. Edwardo-Franco*, 885 F.2d 1002, 1004−06 (2d Cir. 1989), in which the Second Circuit invalidated the defendants' sentences because, before imposing sentences on Colombian natives, the district judge expressed ethnic prejudice against Colombians.  The judge's statements in *Edwardo-Franco* are not comparable to those at issue here.

*Dawson v. Delaware*, 503 U.S. 159 (1992), which Webster also cites, has no relevance to this case.  There, the Supreme Court held that the admission of a stipulation that the petitioner was a member of the Aryan Brotherhood, a white racist prison gang, at the penalty phase of a death penalty trial violated the petitioner's First Amendment rights "because the evidence proved nothing more than [the petitioner's] abstract beliefs."  *Id.* at 162, 167.

Citing *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), Webster now argues that his sentence of 50 years to life, which was the maximum available, constitutes cruel and unusual punishment because "his minimum fixed sentence of 50 years in prison constitutes an unconstitutional *de facto* life sentence as it exceeds his life expectancy" and because the trial court did not account for his youth when sentencing him.  Memo. of Law at 58−59.

In *Graham*, the Supreme Court held that the Eighth Amendment prohibits juvenile offenders who did not commit homicide from being sentenced to life without parole.  560 U.S. at 75.  It reasoned that juveniles are different from adults in that they have an "underdeveloped sense of responsibility;" they "are more vulnerable . . . to negative influences and outside pressures;" and they are more amenable to rehabilitation.  *Id.* at 68.  Two years later, in *Miller*, again emphasizing that youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness," 567 U.S. at 476 (alterations and internal quotation marks omitted), the Court held that the Eighth Amendment prohibits mandatory sentencing schemes that require juvenile offenders to be sentenced to life in prison without the possibility of parole, *id*. at 479.  "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases," it wrote, "we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Id.* at 480.  Lastly, in *Montgomery*, the Court held that *Miller*'s prohibition on mandatory life without parole for juvenile offenders announced a new substantive rule that applies retroactively.  577 U.S. at 212.

The state court found that "the Court's holdings in *Miller* and *Graham* are inapplicable to the defendant's matter because he was not sentenced to life imprisonment without the possibility of parole."  § 440 Decision at 38.  "The defendant is eligible for parole but he has to wait for that

31

opportunity," it continued.  *Id.*[16]  Webster argues that this decision is contrary to, or an unreasonable application of, *Graham*, *Miller*, and *Montgomery*.

The sweeping language the Court used in *Graham* and *Miller* to describe the differences between children and adults for sentencing purposes casts doubt on the efficacy of the sentence imposed on Webster here.  Yet, I cannot conclude, under AEDPA's restrictive standard, that the state court's decision was contrary to, or an unreasonable application of, those cases' holdings.

Neither *Graham* nor *Miller* clearly establishes that sentences imposed on juveniles that allow for parole release constitute cruel and unusual punishment.  *Bowling v. Dir., Virginia Dep't of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019), *cert. denied sub nom.*, *Bowling v. Clarke*, 140 S. Ct. 2519 (2020) ("[T]he Supreme Court has placed no explicit constraints on a sentencing court's ability to sentence a juvenile offender to life with parole."); *Atkins v. Crowell*, 945 F.3d 476, 478–79 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2786 (2020) (denying habeas petition for juvenile homicide offender eligible for release after serving 51 years); *Baldwin v. Garman*, 2020 WL 1465925, at *7−9 (E.D. Pa. Jan. 31, 2020), *report and recommendation adopted*, 2020 WL 1451546 (E.D. Pa. Mar. 25, 2020) (denying habeas petition where juvenile homicide offender was sentenced to 50 years to life at age 17).  *Graham* requires states to provide juveniles convicted of non-homicide offenses "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," but it "does not require the State to release [an] offender during his natural life."  560 U.S. at 75.  Courts have found that "[a] discretionary parole system can thus comply with *Graham*."  *Rainer v. Hansen*, 952 F.3d 1203, 1210 (10th

---

[16] Webster argues that I should review his Eighth Amendment claims *de novo* because the state court found it procedurally barred and "then summarily conclud[ed] that *Miller* and *Graham* were inapplicable" to Webster's case.  Memo. of Law at 60.  But, because the state court addressed the claim's merits, AEDPA deference applies.  *See Tatum v. Lempke*, 481 F. App'x 659, 662 n.4 (2d Cir. 2012); *Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004).

Cir. 2020); *see Virginia v. LeBlanc*, 582 U.S. ___, 137 S. Ct. 1726, 1729 (2017); *Moore v. Warden*, 816 F. App'x 337, 339 (11th Cir. 2020); *Goins v. Smith*, 556 F. App'x 434, 439−40 (6th Cir. 2014), *cert. denied sub nom.*, *Goins v. Lazaroff*, 574 U.S. 824 (2014).   Moreover, in *Montgomery*, the Supreme Court explained that a state may remedy a *Miller* violation—*i.e.*, the imposition of a mandatory life without parole sentence on a juvenile homicide offender—by "permitting . . . the offender to be considered for parole, rather than by resentencing him."  577 U.S. at 212.  "Allowing those offenders to be considered for parole," the Court wrote, "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.*  By providing him the opportunity for parole after 50 years, Webster's sentence meets these cases' requirements.

Citing statistics in an effort to predict his life expectancy, Webster argues that, because he will not be eligible for parole until he is 67 years old, his sentence constitutes *de facto* life without parole.  But the Supreme Court has not "clearly established" that a sentence of 50 years to life imposed on a juvenile is the "functional equivalent" of life without parole.  *Dermirdjian v. Gipson*, 832 F.3d 1060, 1076−77 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 71 (2017); *see Starks v. Easterling*, 659 F. App'x 277, 280 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017) (finding *Miller* inapplicable under AEDPA to a petitioner not eligible for parole until age 77); *Bunch v. Smith*, 685 F.3d 546, 551 (6th Cir. 2012), *cert. denied sub nom.*, *Bunch v. Bobby*, 569 U.S. 947 (2013) (holding that *Graham* does not apply to an 89-year sentence); *cf. Budder v. Addison*, 851 F.3d 1047, 1059−60 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 475 (2017) (granting habeas after finding that *Graham* applies to a sentence that required petitioner to serve 131.75 years before being eligible for parole); *Moore v. Bitter*, 725 F.3d 1184, 1186 (9th Cir. 2013) (granting habeas

after finding that *Graham* applies to a sentence that did not allow for petitioner's release until age 144).  Indeed, in *Lockyer*, the Court found that a sentence of 50 years to life was "materially []distinguishable" from a sentence of life without parole because the petitioner in *Lockyer* "retain[ed] the possibility of parole," albeit at the age of 87.  538 U.S. at 66, 74, 79.  Citing *Lockyer*, the Ninth Circuit in *Dermirdjian* rejected a habeas petitioner's argument that his sentence of 50 years to life, for crimes committed at age 15, violated the Supreme Court's holding in *Miller*.  832 F.3d at 1063, 1076−77.  For the same reasons, I reject Webster's claim that his sentence violates clearly established Supreme Court precedent.

Finally, Webster asserts that *Miller* requires courts to consider that "children are different" whenever a juvenile is sentenced to a life sentence or "even [] a lengthy term of years."  Memo. of Law at 63.  But the Court stressed in *Graham*, *Miller*, and *Montgomery* the uniqueness of a sentence of life without parole.  *See, e.g.*, *Miller*, 567 U.S. at 477 ("Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features[.]"); *Graham*, 560 U.S. at 69−70 ("[L]ife without parole sentences share some characteristics with death sentences that are shared by no other sentences.  The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable."); *accord Montgomery*, 577 U.S. at 207−09 ("*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.") (internal quotation marks omitted).  As a result, fairminded jurists could disagree that those cases require judges to consider the attributes of youth when imposing a sentence other than life without parole.  *See Bowling*, 920 F.3d at 197−98; *Dermirdjian*, 832

F.3d at 1076−77; *Sanders v. Eckstein*, 2019 WL 11505401, at *6 (E.D. Wis. Aug. 8, 2019), *aff'd*, 981 F.3d 637 (7th Cir. 2020).[17]

In sum, Webster has not shown that the state court's denial of his Eighth Amendment claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law."  *See* § 2254(d)(1).

## V.    Conclusion

For the reasons set forth above, Webster's petition for a writ of habeas corpus is denied. Because Webster has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.  *See* 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

**/s/**

**NINA GERSHON**
**United States District Judge**

August 20, 2021
Brooklyn, New York

---

[17] In *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016), in the context of a juvenile sentenced to 100 years, the Seventh Circuit wrote that *Miller*'s "'children are different' passage . . . implies that the sentencing court must *always* consider the age of the defendant in deciding what sentence (within the statutory limits) to impose on a juvenile."  Nevertheless, four years later, in *Sanders*, 981 F.3d at 638, 640, the Seventh Circuit affirmed the district court's denial of habeas relief to the petitioner, who had offended at age 15 and would not be eligible for parole until he was 51 years old.  The Court deemed *Miller*'s requirement that a defendant's youth be considered at sentencing inapplicable to the petitioner's sentence because he "neither committed a homicide nor received a mandatory life sentence."  *Id.* at 643.  The Court distinguished *McKinley*, explaining that the 100-year sentence at issue there was "effectively a life sentence." 981 F.3d at 643.  It continued, "Absent controlling Supreme Court authority that *Miller* requires a sentencing judge to consider a juvenile offender's youth and its attendant circumstances before imposing a sentence other than a *de jure* or *de facto* life-without-parole sentence, we cannot say that the [state] court's decision resulted in an unreasonable application of federal law."  *Id.*